# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nᵒ 06-CV-1718 (JFB) (RLM)

————————————

## VICTOR R. ORTEGA,

Plaintiff,

VERSUS

## MICHAEL J. ASTRUE,
## COMMISSIONER OF SOCIAL SECURITY,

Defendant.

————————————

MEMORANDUM AND ORDER
August 15, 2007

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Victor R. Ortega ("Ortega" or "plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of defendant Commissioner of the Social Security Administration[1] (the "Commissioner" and the "SSA," respectively) that Ortega was not entitled to disability insurance benefits ("SSDI") or Supplemental Security Income ("SSI") under Title II of the Social Security Act (the "Act"). The Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), requesting that the Court affirm her findings. Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings. For the reasons that follow, defendant's motion is granted and plaintiff's cross-motion is denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Prior Proceedings

On December 10, 2002, Ortega filed an application for SSDI (Tr. 72-74)[2], alleging disability due to diabetes mellitus, hypertension, and depression dating from

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is hereby substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

[2] References to "Tr." are to the administrative record in this case.

December 1, 2000. (Tr. 15, 81-90.) Ortega also submitted an application for SSI on November 13, 2003, with a protective filing date of December 10, 2002. (Tr. 16.) The application for SSDI was denied on March 21, 2003. (Tr. 36-40.) On May 12, 2003, Ortega requested a hearing before an administrative law judge ("ALJ"). (Tr. 42-43.) Ortega's request concerned his applications for both SSDI and SSI. (Tr. 52, 60.) On January 20, 2005, a hearing was held. (Tr. 16, 59, 69.) At the hearing, Ortega was represented by counsel. (Tr. 16, 32, 44-45.)

In a decision dated March 28, 2005, the ALJ found Ortega not entitled to a period of SSDI within the Act, nor eligible for SSI payments. (Tr. 12-23.) The Appeals Council denied Ortega's request for review on April 3, 2006, making it the final determination of the Commissioner. (Tr. 6-8.) Thereafter, Ortega sought judicial review before this Court.

B. Non-Medical Evidence

Ortega was born in Puerto Rico on February 17, 1950. (Tr. 78, 240.) He is a citizen of the United States. (Tr. 72.) Ortega began his early education in Puerto Rico, came to the United States for the second and third grades, and returned to Puerto Rico for the remainder of his education. (Tr. 243.) Ortega completed the eighth or ninth grade in school. (Tr. 88, 242.) Ortega has not completed any type of special job training, trade, or vocational school. (Tr. 96.) The record shows that he is able to speak, read and write in English. (Tr. 81, 243.) Ortega is divorced. (Tr. 240.) He has one daughter who is living in California. (Tr. 253.)

Ortega worked as a forklift operator from 1982 through December 1, 2000. (Tr. 243-244.) He worked eight hours per day, five days a week. (Tr. 83.) During that time,

Ortega drove a forklift, repaired piers, and stacked lumber. (Tr. 83.) Ortega never worked as a supervisor or a lead worker. (Tr. 83.) Ortega's position required him to walk, stand, sit, climb, stoop, crouch, and crawl, each for one hour a day, and to kneel for four hours a day. (Tr. 83.) During a workday, Ortega frequently handled and lifted up to seventy-five pounds. (Tr. 83, 93.) Ortega stopped working because the company for which he worked closed on December 1, 2000. (Tr. 16, 82-83, 244.) He has not been employed since that time. (Tr. 82.)

Ortega stated that he collected unemployment benefits through December 2001, one year after losing his job, while looking for work as a forklift operator during that period. (Tr. 257.) He said that he was able to work as a fork lift operator until sometime in December 2001 or early 2002, when he began getting dizzy. (Tr. 82, 258.) Ortega stated that he went to Brooklyn Hospital in July and August 2002 because he was scared by the dizziness that he felt. (Tr. 84, 259.) This was Ortega's first medical treatment for any of his present claims and conditions. (Tr. 247.)

When Ortega applied for disability benefits on December 10, 2002, he alleged inability to work due to diabetes, high blood pressure, depression, low calcium, dizziness, neck and back pain, stiffness in legs, and bad eyesight. (Tr. 82.) Ortega claimed that he was limited in his ability to work because he would fall from dizziness, or his eyesight would become blurry and cause him to fall. (Tr. 82.) Ortega stated that these conditions would not allow him to drive a fork lift, as he had for the previous years. (Tr. 91.) After his application was denied, Ortega requested a hearing on May 12, 2003 and he alleged inability to work due to dizziness, depression, high blood pressure, diabetes, being unstable

on his feet, and having bad eyesight. (Tr. 42.) Ortega asserted that he had been seen by a doctor or hospital for some of the conditions that limited his ability to work. (Tr. 84.)

Ortega testified at the administrative hearing on January 20, 2005 that he has never been hospitalized overnight. (Tr. 244.) He stated that numbness in his left arm bothers him the most. (Tr. 244.) He said that he had no problem with his right side. (Tr. 246.) Ortega stated that he has to keep his left side and left leg moving or else they become stressed and fall asleep. (Tr. 245-246.) Ortega claimed that his left toe becomes black and feels like a needle is there. (Tr. 246.) Ortega also stated that there are no problems with his right leg. (Tr. 246.) Ortega claimed that he has trouble sleeping, and, for an unknown reason, sometimes awakens at 2:00 or 3:00 a.m. feeling weak. (Tr. 247.)

Ortega testified that he found out that he has diabetes in August 2002 (Tr. 247) and he is now taking medication for diabetes.[3] (Tr. 245.) He tests his blood sugar at home regularly and brings the results to his doctor on visits. (Tr. 261.) The blood sugar test results vary. (Tr. 261-262.) In August 2002, Ortega also found out that he has high blood pressure. (Tr. 247.) He is now taking medication for his high blood pressure and he claims that it causes him blurriness in his eyes and dizziness. (Tr. 250.) Ortega reported that glasses do not help with the blurriness. (Tr. 251.) Ortega claimed that he suffers shortness of breath and must sit with his mouth open every night. (Tr. 251.) Ortega also claimed to suffer chest pain. (Tr. 251.) Ortega stated that he has sharp back and neck pain. (Tr.

249.) He believes it is from his prior work. (Tr. 250.) Ortega stated that he complained to his doctor that he was depressed. (Tr. 250.) He is now taking anti-depressant medication. (Tr. 87, 253.) Ortega stated that he was sent to see a psychiatrist but could not go because his insurance plan changed. (Tr. 262.) Ortega stated that he never actually saw a psychiatrist, but that he thinks he has emotional problems because he is very nervous. (Tr. 262.)

At the trial, Ortega stated that his height is 5'9'' and his weight is 191 pounds. (Tr. 252.) Ortega stated that this is not his typical weight, and that he weighed 225 pounds a few years ago and has lost weight. (Tr. 252-253.)

Ortega testified that he has not sought a job of any type in the last few years. (Tr. 260.) He lives with his niece and her children. (Tr. 251-252.) At the time of his application for SSDI and SSI payments, plaintiff was living with his common law spouse and her daughter, both of whom were then receiving SSI benefits. (Tr. 74.) In describing his daily activities, Ortega stated that he enjoys reading and listening to the radio, and he takes walks with his nephew. (Tr. 256.) He occasionally walks half a block to go to church. (Tr. 256.) He cleans his room and shops for groceries in a store one block away. (Tr. 252.) His niece cooks his food. (Tr. 256.) Ortega lives in a first-floor apartment that he accesses by climbing two small stairs. (Tr. 253.) Ortega testified that he has difficulty with the stairs because they make him tired and he must stop. (Tr. 253.) Ortega testified that he can sit for one half hour, stand for ten minutes, and walk for two blocks. (Tr. 254.) Ortega is left-handed, and he stated that he often drops things with his left hand. (Tr. 254-255.) He testified that he is able to lift up to five pounds. (Tr. 255.)

---

[3] On his pre-hearing questionnaire of October 4, 2004, however, Ortega noted that he had already been diagnosed with diabetes in 1998 and began to feel the effects of the disease in 2001. (Tr. 105.)

C. Medical Evidence

1. Treating Physicians

a. Brooklyn Hospital Center

i. Glen Sorrentino, M.D.

Ortega stated that he visited Brooklyn Hospital Center for the first time in July 2002 and was seen by Dr. Glenn Sorrentino ("Dr. Sorrentino"). (Tr. 84.) Ortega visited Brooklyn Hospital at that time because he was not feeling well due to dizziness. (Tr. 84.) Ortega stated that he received medication for high blood pressure, diabetes, and depression were noted.[4] (Tr. 84.)

ii. Follow-up Visit

Ortega was seen at Brooklyn Hospital Center on August 20, 2002. (Tr. 119.) The examining physician noted Ortega's complaints of dizziness, occasional numbness in hands and left big toe, occasional blurry vision, and occasional headaches. (Tr. 119.) No medication was prescribed. (Tr. 119.) The physician noted Ortega's illnesses at that time as diabetes and hypertension, each for the past three years. (Tr. 119.) The physician noted that Ortega had had many sinus blockages since childhood. (Tr. 119.) The physician noted that both Ortega's mother and father had Type II Diabetes and hypertension. (Tr. 119.)

iii. Z. Peymond, M.D.

Ortega was examined at Brooklyn Hospital Center in a follow-up visit as an outpatient. (Tr. 84, 94.) He was seen by Dr. Z. Peymond ("Dr. Peymond") on August 27, 2002. (Tr. 84, 94, 118.) Ortega continued to visit Brooklyn Hospital Center as an outpatient through November 2002. (Tr. 84.) On August 27, 2002, Ortega's chief complaints includes hypertension, diabetes, and possible depression. (Tr. 118.) Ortega reported no pain during the visit. (Tr. 118.) The attending physician noted Ortega's controlled hypertension and his uncontrolled diabetes. (Tr. 118.) The physician noted that Ortega may benefit from antidepressants or sleeping medication, and that Ortega denied suicidal or homicidal ideation. (Tr. 118.) Dr. Peymond prescribed medication to Ortega to control his blood pressure, diabetes, and depression. (Tr. 84, 87.) Specifically, Dr. Peymond prescribed Enalapril for Ortega's high blood pressure, Glyburide for Ortega's diabetes, and the anti-depressant Bupropion. (Tr. 87.) Ortega is currently taking these medications. (Tr. 87.) Ortega reported side effects of dizziness, lightheadedness, headache, and fatigue from all three medications. (Tr. 87, 95.)

iv. Follow-up Visits

Ortega followed up at Brooklyn Hospital Center on October 1, 2002. (Tr. 117.) Ortega was noted to have had controlled diabetes for five years. (Tr. 117.) Ortega's high blood pressure was noted. (Tr. 117.) Ortega reported no pain during the visit. (Tr. 117.) The house physician noted Ortega's medications: Bupropion, Enalapril, and Glyburide. (Tr. 117.)

Ortega followed up at Brooklyn Hospital Center on November 5, 2002. (Tr. 116.) Ortega was noted to have controlled Type II Diabetes. (Tr. 116.) The examining doctor documented that Ortega had no complaints and reported no pain during the visit. (Tr. 116.) Ortega's high blood pressure was noted

---

[4] There is no documentation of this visit other than what plaintiff wrote in his Disability Adult Report on November 22, 2002.

by the examining doctor, and it was noted that Ortega had an eye exam on October 1, 2002. (Tr. 116.) Ortega's blood pressure was 160/78 and a goal of 135/75 was established. (Tr. 116.)

Ortega followed up at Brooklyn Hospital Center on November 19, 2002. (Tr. 115.) Ortega was found to have Type II Diabetes, and it was noted that Ortega had been sent from a clinic for a screening colonoscopy. (Tr. 115.) Ortega's blood pressure was 130/70. (Tr. 115.) Ortega reported no pain during this hospital visit. (Tr. 115.) Ortega was scheduled to return to Brooklyn Hospital on April 15, 2003, for a screening colonoscopy exam. (Tr. 85, 115.)

### v. David Berman, M.D.

Ortega was examined on an outpatient basis by Dr. David Berman ("Dr. Berman") at Brooklyn Hospital at some time during July through November 2002. (Tr. 94.) Ortega's visit included a colonoscopy exam and a follow-up visit for his previously treated conditions. (Tr. 94.) At that time, Ortega was not feeling well due to dizziness and the colonoscopy. (Tr. 94.)

### vi. Agueda Mercado-Acevedo, M.D.

On February 4, 2003, Ortega was seen again at Brooklyn Hospital Center. (Tr. 169.) He reported no pain. (Tr. 169.) His blood pressure was 160/90. (Tr. 169.) The doctor's impressions were hypertension, diabetes, and depression. (Tr. 169.)

On that day, Dr. Agueda Mercado-Acevedo ("Dr. Mercado-Acevedo") noted Ortega's history of uncontrolled hypertension, history of diabetes, medication for depression, and the medical condition of high cholesterol that needed constant follow up. (Tr. 114.)

### vii. Follow-up Visits

Ortega followed up with Brooklyn Hospital Center on February 25, 2003, with blood pressure at 170/90 and right-sided back pain. (Tr. 170.) He again followed up at Brooklyn Hospital Center on March 25, 2003; his blood pressure was 150/86 and he reported no further back pain on his right side and that he felt better. (Tr. 171.) On April 29, 2003, Ortega visited Brooklyn Hospital Center for a renal sonogram that showed normal results. (Tr. 172.)

### b. Field Office Disability Report

On December 11, 2002, accompanied by his wife, Ortega underwent a face-to-face interview with Sean Pendergrass, as per Ortega's claim for SSDI. (Tr. 98-100.) Ortega was described as an Hispanic male with weight at about 190 pounds. (Tr. 99.) The interviewer noted that he observed no physical limitations to Ortega. (Tr. 99.) Ortega expressed no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands or writing. (Tr. 99.) No medical evidence was provided by Ortega at that time. (Tr. 100.)

### c. Richard King, M.D.,
### Psychiatric Examination Report

On February 7, 2003, Ortega visited Dr. Richard King ("Dr. King") for a psychiatric consultative examination and a report was submitted. (Tr. 120.) Dr. King noted that Ortega was casually dressed and neatly groomed, had good personal hygiene, had established a fair rapport, was not in acute distress, and was cooperative, fairly well modulated, friendly, and appropriate. (Tr. 120.) Ortega's speech was coherent and relevant and there was no thought disorder.

(Tr. 120.) Ortega appeared euthymic, and not significantly depressed or anxious. (Tr. 120.) Ortega had no hallucinations, delusions, suicidal ideation, ideas of reference, or paranoid trends. (Tr. 120.) Ortega was not considered a suicide risk. (Tr. 120.) Dr. King noted that there was no history of prior psychiatric difficulties or consultations, nor a history of drug or alcohol dependence.[5] (Tr. 120.) Ortega's current medications were Glyburide, Enalapril, and Norvasc. (Tr. 120.)

Dr. King noted Ortega's intellectual function to be on an average level. (Tr. 120.) Ortega's insight and judgment were fair and his attention and concentration were adequate. (Tr. 120.) Ortega's fund of information was adequate, his memory was grossly intact, his sensorium was clear, and he was oriented to time, place, and person. (Tr. 120.)

Dr. King diagnosed Ortega with adjustment disorder of adult life. (Tr. 121.) Dr. King noted that Ortega was anxious and depressed to a mild degree. (Tr. 121.)

Dr. King's prognosis for Ortega was fair. (Tr. 121.) Dr. King noted that Ortega has a satisfactory ability to understand, carry out, and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers, and work pressure in a work setting. (Tr. 121.) Dr. King noted that Ortega might benefit from psychiatric treatment and a substance abuse program. (Tr. 121.) Dr. King noted that Ortega can manage his own funds. (Tr. 121.)

---

[5] While Ortega had denied a history of alcohol abuse when speaking with Drs. King and Rocker, Ortega acknowledged his history of alcoholism when consulting Dr. Meadow, and after conducting an examination, Drs. Meadow and Joseph each reported indications of Ortega's past alcohol abuse.

### d. Babu Joseph, M.D., Consultative Examination Report

On February 7, 2003, Ortega visited Dr. Joseph for a physical consultative examination. (Tr. 122.) Dr. Joseph noted that Ortega is a 53-year-old male who admitted to having had diabetes for five years, hypertension for five years, and a nervous disorder for one year. (Tr. 122.) Dr. Joseph noted Ortega's complaints of dizziness, weakness, blurring of vision, and numbness of hands and feet. (Tr. 122.) Dr. Joseph noted that Ortega denied having headaches and that Ortega had no history of stroke. (Tr. 122.) Ortega informed Dr. Joseph that he suffered from depression, anxiety, and insomnia, and had seen a psychiatrist for the nervous disorder. (Tr. 122.) Ortega also stated that he had a family history of asthma. (Tr. 122.)

Dr. Joseph noted that Ortega spends his time watching TV and going for walks, and his wife does his cooking and cleaning. (Tr. 122.) Ortega was a smoker for twenty-five years, smoking one-half of a pack of cigarettes per day. (Tr. 122.) Dr. Joseph noted that Ortega is a former alcoholic and a non-drug user. (Tr. 122.) Ortega denied any history of disease of the heart, lung, liver, or kidney, and also denied having a history of arthritis, gastrointestinal problems, seizure disorders, or cancer. (Tr. 122.) Ortega's blood pressure was 154/90, he weighed 180 pounds at a height of 6'5'', and his vision without glasses was found to be 20/50 in his right eye and 20/40 in his left eye. (Tr. 122.)

Dr. Joseph noted that Ortega appears his stated age of fifty-three and is in no acute distress. (Tr. 123.) Ortega's level of communication was adequate; his skin was moist and well perfused with no cyanosis and no jaundice; his gait and station were normal. (Tr. 123.) Ortega had no difficulty dressing

and undressing, or with getting on and off the examination table. (Tr. 123.) Ortega had no obvious hearing defects, no congestion, and no tonsillar enlargement or erythema. (Tr. 123.) Ortega's pupils were round, regular, and reacted equally to light. (Tr. 123.) His extra-ocular movements were intact and bilaterally symmetric. (Tr. 123.) Ortega's neck was supple with no masses, his lymph nodes and thyroid were not enlarged;, his jugular veins were not distended, and his carotid pulsations were palpable and equal. (Tr. 123.)

Dr. Joseph examined Ortega's spine and noted that his lumbar lordosis was normal with no scoliosis, no paraspinal muscle spasm, and no tenderness. (Tr. 123.) Ortega's lumbar spine had normal range of motion ("ROM"). (Tr. 123.) Straight leg raising was to 90 degrees for each leg. (Tr. 123.) His cervical spine had a normal ROM. (Tr. 123.) Dr. Joseph examined Ortega's chest and respiratory area and noted that anterior-posterior diameter and excursion of chest wall were within normal limits, there was no deformity of chest, his lungs were resonant to percussion, and no rales, rhonchi, or wheezes were heard. (Tr. 123.) The expiratory phase of respiration was not prolonged. (Tr. 123.) Ortega's heart rate was regular with S1 and S2 within normal limits, no S3, no S4, no systolic or diastolic murmurs heard, and no friction rubs heard. (Tr. 123.) Ortega has an old surgical scar on the right lower quadrant of his abdomen, from an appendectomy thirty years ago. (Tr. 119, 123.) His abdomen was soft and symmetrical with no rigidity and no rebound tenderness. (Tr. 123.) Auscultation transmitted normal active bowel sounds. (Tr. 123.) Neither ascitis nor any abnormal masses were felt, and his liver and spleen were not palpably enlarged. (Tr. 123.)

Dr. Joseph examined Ortega's joints and found that all joints had full ROM with no joint deformity, swelling, redness, or heat. (Tr. 123.) Ortega made a full fist bilaterally, and fine and coarse finger dexterity were both normal. (Tr. 123.) Ortega had no clubbing, cyanosis, edema, stasis dermatitis, brawny edema, or ulceration, and his peripheral pulses were palpable and equal. (Tr. 123.) Ortega was able to stand on his toes normally. (Tr. 123.) His muscle strength was normal and there was no muscle wasting. (Tr. 123.) Dr. Joseph noted that Ortega was oriented and alert with gross memory intact. (Tr. 124.) His deep tendon reflexes were 2+ and equal; Babinski reflexes were negative; his sensory was grossly preserved to touch and vibration; and no tremor was noted. (Tr. 124.) Ortega's laboratory results showed EKG sinus rhythm at the rate of 93/mt, left axis, PR interval 0.16 and QRS-0.08; no acute ST-T wave changes; and no ventricular hypertrophy was present. (Tr. 124.)

Dr. Joseph concluded that his impression of Ortega included diabetes, hypertension, and nervous disorder. (Tr. 124.) Dr. Joseph opined that Ortega is able to perform the following work-related activities: walking, standing, and sitting with no limitation; carrying, lifting, pulling and pushing with no limitation. (Tr. 124.) Dr. Joseph noted a guarded prognosis for Ortega, and recommended regular follow-up at a physician's office for his medical problems. (Tr. 124.)

e. T. Hayes,
Disability Examiner

On February 25, 2003, Ortega met with T. Hayes ("Hayes"), who reviewed the record and completed an assessment of Ortega for the State Agency's Physical Residual Functional Capacity Assessment. (Tr. 127.) Ortega's

primary diagnosis was listed as diabetes, and his secondary diagnosis was listed as hypertension. (Tr. 127.) It was found that Ortega retained the residual functional capacity to lift fifty pounds occasionally and to lift twenty-five pounds frequently. (Tr. 128.) Hayes also found that Ortega could stand and/or walk, with normal breaks, for approximately six hours in an eight-hour workday. (Tr. 128.) It was found that Ortega was unlimited in his ability to push and/or pull, and to operate hand and/or foot controls. (Tr. 128.) These conclusions were supported by an examination of Ortega, which revealed the following: Ortega appeared his stated age and was in no acute distress, his blood pressure was at 154/90, his gait and station were normal, he had no difficulty dressing or undressing and also getting on or off the examination table, his lumbar spine had normal ROM, his straight leg raising was ninety degrees, his chest was normal, his lungs were cta, his heart was regular with no S3 or S4, his joints were normal, his extremities were normal, he was neurologically intact, and his EKG was within normal limits. (Tr. 128.)

Ortega was found to have no established postural limitations, no established manipulative limitations, no established visual limitations, no established communicative limitations, and no established environmental limitations. (Tr. 130-135.) It was also noted that a treating or examining source statement regarding Ortega's physical capacities was on file, and the treating source's conclusions about Ortega's limitations were not significantly different than the current findings. (Tr. 136.)

### f. G. Peters, Ph.D.,
### State Agency Physician

On February 27, 2003, Ortega met with Dr. G. Peters ("Dr. Peters"), a state agency physician, who reviewed the evidence on record and completed an assessment of Ortega's mental functional capacity. (Tr. 138.) Ortega's medical disposition was summarized as an impairment that was not severe, based upon his affective disorders. (Tr. 138.) Dr. Peters opined that Ortega had an adjustment disorder with mild anxiety and a mild depressed mood. (Tr. 141.) He also stated that Ortega had mild difficulties maintaining concentration, persistence, or pace, and had no limitation in the activities of daily living or in maintaining social functioning. (Tr. 148.) Dr. Peters also found that Ortega never had had repeated episodes of deterioration of extended duration. (Tr. 148.) The doctor found no other evidence to support any other mental affectations or disease. (Tr. 149.)

### g. Dr. Sarro, M.D.,
### Treating Physician

Dr. Sarro was Ortega's treating physician from May 20, 2003 through August 26, 2003. (Tr. 239.) Dr. Sarro first examined Ortega on May 20, 2003. (Tr. 203.) He noted Ortega's diabetes and hypertension, and stated that both conditions were controlled. (Tr. 203.) Ortega's blood pressure was 130/85. (Tr. 203.) Ortega reported no allergies. (Tr. 203.) Dr. Sarro noted Ortega's medications: Glyburide and Enalapril. (Tr. 203.)

Dr. Sarro examined Ortega on June 3, 2003. (Tr. 204.) He noted Ortega's complaints of nervousness, depression, and frequent nose bleeds. (Tr. 204.) Ortega's blood pressure was 150/90. (Tr. 204.) Dr. Sarro noted Ortega's continued medications. (Tr. 204.)

Dr. Sarro examined Ortega on June 10, 2003. (Tr. 205.) Ortega complained of back pain and neck pain, as well as back spasms.

(Tr. 205.) Dr. Sarro noted Ortega's continued medications and recommended Celebrex for his back. (Tr. 205.) Dr. Sarro noted psoriasis, hypertension, diabetes, and nose bleeding on June 29, 2003. (Tr. 205.)

Dr. Sarro examined Ortega on July 15, 2003. (Tr. 206.) Ortega complained of frequent renal bleeding and continued spasms. (Tr. 206.) Ortega followed up on July 17, 2003. (Tr 206.) On July 22, 2003, Ortega reported renal bleeding to Dr. Sarro again. (Tr. 207.) Ortega followed up with Dr. Sarro on July 31, 2003. (Tr. 208.) His blood pressure was 140/90. (Tr. 208.)

Dr. Sarro examined Ortega on August 26, 2003. (Tr. 209.) Dr. Sarro noted that Ortega's hypertension was controlled and he noted Ortega's continued medications. (Tr 209.) Dr. Sarro also noted that Ortega reported no bleeding. (Tr. 209.)

In response to Ortega's complaints and conditions, Dr. Sarro advised Ortega to try to walk in the morning and in the afternoon, and to eat right. (Tr. 259.)

### h. Audiological Evaluation

Dr. Sarro referred Ortega for an audiological evaluation on May 20, 2003, which showed moderate to severe sensorineural hearing loss. (Tr. 220.)

### i. John Ibarra, M.D.,
### New York Radiographic Consult Services

X-rays of Ortega's cervical spine, conducted by Dr. John Ibarra ("Dr. Ibarra") on June 18, 2003, showed degenerative osteoarthritic changes involving the atlantoaxial joint and C5 vertebral endplate. (Tr. 216.) It was noted that Ortega's cervical iordotic curvature was normal, and his cervical spine revealed no evidence of compression fractures. (Tr. 216.)

X-rays of the lumbar spine on the same day showed narrowing of the T11-T12, T-12-L1, L4-L5, and L5-S1 interverebral disc space height and sclerotic focus overlying the T-12 vertebral body. (Tr. 217.) Correlation with an MRI examination was suggested. (Tr. 217.)

### j. Douglas Wolff, M.D.,
### Nerve Conduction Studies

Ortega met with Dr. Douglas Wolff ("Dr. Wolff") for nerve conduction studies on July 2, 2003, and complained of neck pain, back pain, numbness, tingling, weakness in both the upper and lower extremities. (Tr. 210.) The electrodiagnostic studies showed mild chronic C3, C4, C5, C6, L3, L4, L5, and S1 radiculopathy on the right and left, and showed peripheral neuropathy of the right upper extremities, and the bilateral upper and lower extremities. (Tr. 211.) Needle EMG examination revealed evidence of peripheral neuropathy of the bilateral upper extremities. (Tr. 212.)

### k. Long Island College Hospital

Ortega was seen at Long Island College Hospital on March 29, 2004. (Tr. 198.) He reported that he needed prescriptions. (Tr. 198.) His diagnoses were diabetes, hypertension, and allergies. (Tr. 198-199.)

Ortega was seen again at Long Island College Hospital on August 17, 2004. (Tr. 197.) Ortega reported that he needed prescriptions for high blood pressure and diabetes. (Tr. 197.)

### l. Woodhall Hospital[6]

Ortega stopped seeing Dr. Sarro because of confusion with Medicaid and health insurance coverage. (Tr. 255.) Ortega visited Woodhall Hospital because there is a Medicaid office there that permitted Ortega to go through the emergency room to be treated, so that he could apply for Medicaid. (Tr. 255.) Ortega reported going there three times, with the last time in July 2004. (Tr. 255-256.)

### m. Michael Raffinan, M.D., Treating Physician

Ortega began seeing Dr. Michael Raffinan ("Dr. Raffinan") in approximately March 2004. (Tr. 239.) Ortega noted that Dr. Raffinan was his current treating physician on October 5, 2004, and reported that Dr. Raffinan sometimes increased his medication dosages. (Tr. 109.) Dr. Raffinan prescribed Norvasc to Ortega, beginning in approximately 2003, for high blood pressure and chest pain. (Tr. 102, 111.) Dr. Raffinan proscribed Glyburide to Ortega, beginning in approximately 2003, for his blood vessels. (Tr. 102, 111.) Dr. Raffinan proscribed Quinaretic to Ortega in 2004 for diabetes and cholesterol. (Tr. 111.)

On April 2, 2004, after instructing Ortega to fast, Dr. Raffinan did extensive laboratory testing, including blood and urinalysis. (Tr. 200.)

### n. Steven Rocker, M.D., Consultative Physician

On October 21, 2004, Ortega was examined by Dr. Steven Rocker ("Dr. Rocker"), a consultative examiner. (Tr. 179.)

Ortega told the doctor that he had had diabetes for ten years, and took an oral hypoglycemic for it and tested his blood sugar at home. (Tr. 179.) Ortega reported no recent weight loss, and did not complain of paresthesia or visual impairment. (Tr. 179.) Ortega reported that he had hypertension for ten years and had been complaining of chest pain for several years, which occurred once every two or three weeks. (Tr. 179.) Ortega stated that the chest pain usually occurred at night while lying down in bed, and was not related to activity. (Tr. 179.) Ortega stated that the pain was located mid-chest and did not radiate. (Tr. 179.) Ortega described the pain as a needle-like sensation, with duration from seconds to minutes. (Tr. 179.) Ortega reported an occasional suffocating feeling and had no complaint of dyspnea. (Tr. 179.) Ortega's current medications were Quinaretic, Glyburide/metformin, Norvasc, and aspirin. (Tr. 179.) Ortega denied any recent hospitalizations. (Tr. 179.)

Ortega reported that he smoked a pack of cigarettes per day for thirty years and denied any alcohol or drug abuse. (Tr. 179.) He stated that his nephew had driven him to the appointment and that he sometimes travels by public transportation. (Tr. 179.) He reported that he spends most of his time watching television and keeping appointments. (Tr. 179.) Ortega reported that his family history was positive for hypertension, diabetes, and cardiac disease. (Tr. 180.) Ortega weighed 172 pounds. (Tr. 180.) Dr. Rocker stated that Ortega was a slightly overweight Hispanic male, well developed, well nourished, casually dressed, well groomed, and in no distress. (Tr. 180.) His affect and behavior were appropriate. (Tr. 180.) Ortega's blood pressure was 150/80. (Tr. 180.) His pupils were equal, round, and reactive to light. (Tr. 180.) His visual acuity was OD 20/40, OS 20/50, and was corrected. (Tr. 180.) Ortega's nasopharnyx was clear. (Tr. 180.) Ortega's neck was supple, with his trachea at midline

[6]As of the date of the ALJ hearing, plaintiff's medical records from Woodhall Hospital had not been provided in their entirety to the ALJ. (Tr. 239-243.)

with no jugular venous distention and no hepatojugular reflux or thyromegaly. (Tr. 180.) His carotids were without cruits. (Tr. 180.) Ortega's chest was negative and his lungs were clear to percussion and auscultation. (Tr. 180.) His heart has a regular rhythm, with S1 and S2 normal and no murmurs or gallops. (Tr. 180.) The doctor noted a surgical scar on his abdomen, but no masses and no organomegaly on the soft, non-tender abdomen. (Tr. 180.) The doctor noted that Ortega's extremities had no clubbing, cyanosis, or edema, and peripheral pulsations were intact. (Tr. 180.) Station and gait were normal. (Tr. 180.) Ortega had no difficulty transferring from a seated position or on and off the examining table. (Tr. 180.) He had full use of both hands and arms in dressing and undressing, and his grasp and manipulation of both hands was normal. (Tr. 180.) All of his joints had full range of motion without deformity, swelling, warmth, or tenderness, and there was no muscular atrophy. (Tr. 180.)

According to Dr. Rocker, Ortega was alert and oriented "times three," his cranial nerves were intact, his straight-leg raising was negative and Ortega was hyporeflexive throughout.[7] (Tr. 181.) Dr. Rocker found that his motor and sensory was normal and cerebellar function was intact, his lymph nodes were not enlarged and all laboratory data was normal, with the exception of one APC present. (Tr. 181.)

Dr. Rocker's impression included Diabetes Mellitus Type II, as per Ortega's history, with no evidence of end organ damage; hypertension; and atypical non-specific chest pain, with no proven organic etiology for the symptom. (Tr. 181.) He opined that Ortega had no limitation in the abilities to hear, speak, sit, handle objects, or

stand. (Tr. 181.) Ortega had possible slight limitation for walking, lifting, and carrying. (Tr. 181.) Dr. Rocker's prognosis was fair. (Tr. 181.)

o. Herbert Meadow, M.D.,
Consultative Psychiatrist

Also on October 21, 2004, Ortega was examined by Dr. Herbert Meadow ("Dr. Meadow"), a consultative psychiatrist. (Tr. 185-187.) He noted that Ortega had been out of work since 2000 when his company closed. (Tr. 185.) Ortega reported no history of psychiatric hospitalization or treatment. (Tr. 185.) Ortega described being depressed but was unable to give any specific reasons for it. (Tr. 185.) Ortega reported that he occasionally gets anxious, and has no history of panic attacks or paranoia. (Tr. 185.) He has no history of hallucinations. (Tr. 185.) Ortega reported a history of alcohol abuse which he stopped in 2001. (Tr. 185.)

Dr. Meadow observed that Ortega's gait was normal (Tr. 185.), his speech was coherent and goal directed (Tr. 185-186.) And there was no evidence of a thought process disorder. (Tr. 186.) Affect was appropriate to thought content. (Tr. 186.) Ortega was found to be oriented for time, place, and person, and his general fund of information was within normal limits. (Tr. 186.)

Ortega's recent and remote memory were intact and comprehension was adequate. (Tr. 186.) Dr. Meadow found that Ortega's intelligence level was in the low average to average range and that his insight and judgment were not impaired. (Tr. 186.) Dr. Meadow's impressions were alcohol abuse in remission and dysthymia. (Tr. 186.) He deferred diagnoses at Axes II and II. (Tr. 186.) Ortega's prognosis was fair, and Dr. Meadow stated that some psychiatric treatment would probably be beneficial. (Tr. 187.) He opined that although Ortega had a

---

[7] Ortega correctly identified familiar individuals, and provided the correct time, date and location.

psychiatric disorder, it did not interfere with is ability to function or work. (Tr. 186.)

### p. Dr. Henry,
### Treating Physician

On January 20, 2005, Ortega reported that his current treating physician was Dr. Henry. (Tr. 259.) In response to Ortega's complaints and conditions, Dr. Henry had advised Ortega not to stay inside his home [all day] because it would keep him sick. (Tr. 259.) He suggested that Ortega take walks in the mornings and afternoons. (Tr. 259.)

### D. The Present Action

Plaintiff filed the present action on April 12, 2006. The defendant and plaintiff filed their fully submitted cross-motions for judgment on the pleadings on December 13, 2006, and on February 1, 2007, respectively.

### II. DISCUSSION

### A. Applicable Law

### 1. Standard of Review

A district court may only set aside a determination by an ALJ that is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" – "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997). Furthermore, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Social Sec.*, 143 F.3d 115,

118 (2d Cir. 1998) (citing *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111 (citing Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988); *see also Jones*, 949 F.2d at 59 ("[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.") (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### 2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R

§§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### B. Application

In this case, the ALJ properly applied the five-step procedure for evaluating disability claims. At step one, the ALJ found that Ortega had not engaged in substantial gainful activity since his alleged disability onset date of December 1, 2001. (Tr. 17.) At step two, the ALJ determined that Ortega suffered from hypertension and non-insulin diabetes mellitus, which have not always been adequately controlled, and which, as conditions that will require monitoring and treatment for the rest of the claimant's life, "and in resolving all reasonable doubt in claimant's favor," could constitute severe impairments. (Tr. 20.) At step three, the ALJ found that Ortega's impairments, although severe, did not meet the criteria of the impairments set forth in the Listing of Impairments in 20 C.F.R. Para. 404, Subpart P, Appendix 1. (Tr. 22.) At step four, the ALJ considered medical and other evidence in the record and found that Ortega did not retain the residual functional capacity to perform his past relevant work as a fork-lift operator in a lumber yard. (Tr. 21-23.) The occupation of a fork lift operator is generally performed in the national economy as medium work. (Tr. 21.) Pursuant to Social Security Ruling (S.S.R.) 83-10,

> The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the

remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

*See also* 20 CFR §§ 404.1567(c) and 416.967(c). Medium work requires the capacity to lift or carry up to fifty pounds, stand or walk for up to six hours, and sit for up to six hours, and the ALJ found that Ortega retained the following residual functional capacity: able to lift, carry, push, or pull up to twenty-five pounds frequently and up to fifty pounds occasionally; able to sit, stand, or walk for six to eight hours in an eight-hour day. (Tr. 22.) Thus, if the ALJ had adhered

to the view that a forklift operator generally performs medium work, Ortega would have been capable of his past job as a forklift operator because the ALJ found he met the criteria for medium work. (Tr. 22-23.) The ALJ noted, however, that Ortega's particular job as a forklift operator allegedly entailed lifting and carrying up to seventy-five pounds (not just fifty pounds), and in the absence of testimony of a vocational expert, "and resolving all reasonable doubt in the claimant's favor," the ALJ found that Ortega could not perform the job as he actually performed it in the past because it was too exertionally demanding. (Tr. 21.) At step five, the ALJ found that Ortega was able to do other work in the national economy, based on the Medical-Vocational Guidelines.[8] (Tr. 21-23.)

In opposing defendant's motion and cross-moving for judgment on the pleadings, plaintiff argues that the ALJ failed to obtain sufficient evidence and failed to properly consider the submitted evidence. (Pl.'s Mem at 8-26.) Specifically, plaintiff argues that

_____

[8] Plaintiff's argument that the ALJ did not uphold his burden of showing that Ortega could perform at the medium exertional level for Step 5 (Pl.'s Mem. at 23-24), is thus without merit. In the absence of non-exertional disabilities, and without a vocational expert's opinion, the ALJ based his finding on the consistent medical sources who opined that plaintiff was capable of doing at least medium work, including Dr. Babu (Tr. 124) and Dr. Rocker (Tr. 181). No other medical source suggested that plaintiff was unable to do the physical demands of medium work. The ALJ relied on the Medical-Vocational Guidelines at step 5, the rules of which account for the presence of a significant number of unskilled jobs at each exertional level in the national economy, to satisfy his burden of showing that there are jobs in significant numbers that plaintiff can do. (Tr. 276-77.) It is appropriate for the SSA to use the pre-established medical vocational guidelines for determination. *Heckler v. Campbell*, 461 U.S. 458, 467 (1983).

the ALJ (1) should have sought out opinions and detailed residual capacity assessments of Ortega's treating physicians so that he could properly weigh the evidence regarding Ortega's alleged disability (Pl's Mem. at 7-8), (2) should not have determined at Step 2 that Ortega's claim of mental disability was non-severe unless he supported his determination with an evaluation under the standard in the Step 2 sequential evaluation, as well as a painstaking function by function evaluation of the medical findings (Pl's Mem. at 12-13), (3) should not have based his residual functional capacity and credibility assessments upon his own lay impression (Pl's Mem. at 14), (4) should not have relied upon the state agency physical residual functional capacity assessment findings, because the assessment was not performed by a physician, but a disability analyst, for whom the ALJ failed to admit into the record a statement of the healthcare professional's qualifications (Pl's Mem. at 14-15), (5) should have provided the consultative examiners with the radiographic and electrodiagnostic reports, which were provided the day of the hearing, so that they could be adequately informed in making their own assessments (Pl's Mem. at 16), (6) should not have relied on the psychiatric consultative report from Dr. Meadow because, plaintiff alleges, he regularly provides similarly vague and useless feedback and thus the ALJ's conclusions on Ortega's alleged mental disability cannot be rationally supported (Pl's Mem. at 16-17), (7) should have considered the combined effects of Ortega's impairments in deciding non-severity (Pl's Mem. at 17) and should have addressed how the evidence could be reasonably interpreted to support Ortega's ability to perform past relevant work, (Pl's Mem. at 18), (8) should not have drawn any inferences from a failure to seek regular medical treatment, since Ortega had good reason, including lack of insurance, which the ALJ allegedly ignored (Pl's Mem. at 19-21), and (9) should not have viewed Ortega's exaggeration of symptoms as discrediting, but rather should have acknowledged that exaggeration of symptoms is itself an accepted characteristic of chronic pain and sought further evidence (Pl's Mem. at 21-22). Plaintiff seeks reversal based on the ALJ's alleged legal error. This Court will consider each argument in turn.

### 1. Sufficient Data and Opinion from Treating Physicians

Ortega alleges that the ALJ was required to recontact Ortega's treating sources for clarification of their medical opinions and did not fully develop the record. Recontact of a medical source is required only when the evidence the Commissioner receives from the source is inadequate for the Commissioner to determine whether the Plaintiff is disabled. 20 C.F.R.§§ 404.1512(e) and 416.912(e). Even if evidence in a claimant's case record is inconsistent with other evidence or is internally inconsistent, the ALJ is required to obtain additional evidence, including recontacting medical sources, only if the ALJ cannot decide whether a claimant is disabled based on the existing evidence. 20 C.F.R. § 416. 927(c).

The Second Circuit has noted that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d. Cir. 1999) (citing *Perez*, 77 F.3d at 48).

Here, the objective evidence was wholly consistent with the opinion evidence in the record. The medical record showed sparse treatment and few objective findings. The opinion of the medical sources in the record were consistent with Ortega's treating history and objective findings and did not show that

he was incapable of doing medium work. Indeed, x-rays showed some degenerative changes in the cervical and lumbar spines. (Tr. 216-17.) Nerve conduction and needle EMG studies showed evidence of peripheral neuropathy in Ortega's extremities. (Tr. 211-12.) However, Ortega's lumbar lordosis was normal. (Tr. 122.) There was no spasm or tenderness in Ortega's lumbar spine and his spine had full ranges of motion. (Tr. 123.) Ortega's gait and station were normal. (Tr. 180, 185.) His joints had full ranges of motion. (Tr. 123, 180.) His fine and coarse finger dexterity were intact (Tr. 123), and Ortega had full use of both arms. (Tr. 180.) Ortega's grasp and manipulation were found to be normal. (Tr. 180.) In his extremities, motor strength was normal with no muscle wasting. (Tr. 123, 180.) His neurological examination was normal (Tr. 123), his reflexes were normal (Tr. 124), and his sensation was intact. (Tr. 124, 181.)

Moreover, all medical sources opined that Ortega was capable of doing at least medium work. Dr. Babu opined that plaintiff could walk, stand, sit, lift, carry, push, and pull without limitation. (Tr. 124.) Dr. Rocker opined that Ortega had no limitations in the ability to sit or stand and he had possible slight limitations in his ability to walk, lift and carry. (Tr. 181.) Plaintiff presented no other medical evidence to suggest that he was unable to do medium work.

While the Commissioner has a duty to fully develop the record, plaintiff bears the ultimate burden of proving that he was disabled. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) ("[I]t was proper for the ALJ to rely on the absence of findings . . . concerning plaintiff's alleged inability to sit for prolonged periods in deciding that she could resume her [past] work."); *see also Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The [Commissioner] is entitled to rely not only on what the record says, but also

what it does not say.") (citing *Rutherford v. Schweiker*, 685 F.2d 60, 63 (2d Cir. 1982); *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam)). Plaintiff had ample opportunity to submit additional evidence of his impairment, if such existed. Plaintiff was represented by an attorney at the administrative hearing and had the opportunity to present additional relevant evidence to the ALJ at that venue. (Tr. 238-239.) Plaintiff also had the opportunity to submit additional evidence to the Appeals Council with his request for review (*see* Tr. 5-6), or he could have presented new evidence to this Court for consideration of a new evidence remand under 42 U.S.C. § 405(g). Plaintiff's allegation that he was not afforded full review of his claim due to insufficient record is without merit. (Pl.'s Mem. at 7, 22-25.)

In sum, because the ALJ was presented with a complete and consistent medical history of the plaintiff – to which the plaintiff chose not to supplement with alleged additional evidence – the ALJ had no obligation to further develop the record.

## 2. ALJ's Step 2 Finding of Non-Severity for Mental Disability Claims

Plaintiff alleges that his mental impairments were severe at step two. (Pl.'s Mem at 12-14.) However, plaintiff has not established that his mental impairments significantly limited his ability to do mental work related activities. *See* 20 C.F.R. § 404.1521(a). Basic work activities relate to the abilities and aptitudes necessary to do most jobs. *See* 20 C.F.R. § 404.1521(b). These activities include mental functions such as understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. *Id.*

The objective and opinion evidence in the record does not show that Ortega's alleged mental impairment significantly affected his ability to do basic mental work activities. Ortega's mental functioning was average to low average range. (Tr.120, 186.) His insight and judgment were deemed fair. (Tr. 120.) Attention and concentration were adequate (Tr. 120.) and memory was grossly intact. (Tr. 120, 186.) Ortega's thought processes were normal, and affect was appropriate to thought content. (Tr. 186.) Ortega's general fund of information was within normal limits. (Tr. 186.)

Ortega did not receive any treatment for his alleged mental impairments. (Tr. 262.) The consultative examiners who evaluated Ortega's mental status uniformly opined that Ortega was capable of doing unskilled work. Dr. King opined that Ortega had a satisfactory ability to understand, carry out and remember instructions and to respond appropriately to supervisors. (Tr. 121.) Dr. Meadow opined that Ortega's psychiatric impairment did not interfere with his ability to function. (Tr. 186.) Dr. Peters, a state agency physician, opined that Ortega had mild difficulties maintaining concentration, persistence and pace but no limitations in social functioning or in the activities of daily living. (Tr. 48.) Because there is no objective, laboratory, or opinion evidence that would suggest that plaintiff's alleged mental impairment was severe at step two, plaintiff's argument is without merit.

### 3. ALJ's Lay Impression

Ortega argues that the ALJ improperly based his residual functional capacity and credibility assessments upon his lay impression that such abnormal findings as Ortega presented were not unusual in a fifty-three-year-old man. (Pl.'s Mem. at 14.) Although the ALJ noted in his decision that "the significance of these mildly abnormal findings [consistent with mild cervical and lumbosacral radiculopathy and degenerative changes of the spine] in a 53 year old male is not unusual," the ALJ did not base his decision on his own statement. (Tr. 274.) Instead, the ALJ immediately went on to note in his decision that taking the evidence of the mild abnormalities "together with the lack of evidence documenting treatment for pain, and the claimant's failure to even mention these complaints during his hearing" is what persuaded him that the documented mild abnormalities had "no more than minimally affected [Ortega's] ability to perform basic work activities." (Tr. 274.) Thus, the Court finds the ALJ's conclusion on this issue to be supported by the record and the Court finds plaintiff's argument to the contrary to be unpersuasive.

### 4. Lack of Statements of Healthcare Professional Qualifications in the Record

Plaintiff alleges that the ALJ's reliance on certain sources was improper because their "professional qualifications" were not in the record. (Pl's Mem. at 14-15). Plaintiff provides little support for this argument. (*Id.*) Plaintiff points only to the Hearings, Appeals and Litigation Law manual ("HALLEX"). (Pl's Mem. at 15.) HALLEX exists to "convey[] guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff;" its principles are not controlling. HALLEX I-1-0-1, 2005 WL 1863821 (S.S.A.), *available at* http://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html. The Social Security Administration has never instituted an official policy for the identification of healthcare professionals, including consultative or non-examining state agency review physicians. *See* 1 Barbara Samuels, *Social Security Disability Claims Practice and Procedure* § 25:12.1 (2d ed. 2007) [hereinafter "S.S.D.C.P.P."]; *see also* 20 C.F.R. § 404.1527(f) (listing the rules that an ALJ must

follow when considering the opinion of consultative sources, which do not include submitting the healthcare professional qualifications to the record). Information offered via HALLEX is a normative set of procedures and does not impose the consequences of legal error if not followed. *See* 1 S.S.D.C.P.P. § 25:12.1]. "ALJs may not voluntarily be following these procedures and guidelines; advocates must, therefore, test their efficacy by attempting to enforce them." *Id.*

Here, the Commissioner noted that the findings and opinions of these sources were consistent with the other evidence in the record. The other evidence in the record did not establish that plaintiff was disabled. Thus, even in the absence of the findings and opinions of the SSA consultative examinations, the ALJ's conclusions are supported by substantial evidence in the record. (Tr. 273-75.) Accordingly, plaintiff's allegation of error on the basis of the ALJ's failure to introduce such credentials into the record is without merit.

### 5. Radiographic and Electrodiagnostic Reports Provided to the ALJ on the Day of the Hearing Were Not Provided to Consultative Examiners

Plaintiff also contends that, because the ALJ did not provide the consultative examiners with the additional radiographic and electrodiagnostic reports that were submitted on the day of the hearing, the consultative assessments were not complete. (Pl.'s Mem. at 16.) According to plaintiff, the ALJ therefore "could not reasonably rely" on the consultative examiners' reports in finding that plaintiff's orthopedic and neurological impairments were non-severe. (*Id.*) In fact, in addressing plaintiff's neurological impairments, the ALJ relied not on the consultative examiners' assessments of plaintiff, but on the July 2003

electrodiagnostic testing itself, as well as on the findings of plaintiff's treating physicians, Dr. Raffinan and Dr. Sarro. (Tr. 273.) The ALJ specifically noted that such testing "yielded abnormalities consistent with peripheral neuropathy and cervical and lumbosacral radiculopathy," conditions that were described in the reports as "mild." (*Id.*) Similarly, the ALJ specifically acknowledged the June 2003 x-rays that revealed "degenerative changes of the spine," but concluded that there was no other documentation in the record that plaintiff had received any treatment for musculoskeletal pain involving the spine or left upper extremity." (*Id.*)

In short, it is clear that: (1) the ALJ did not rely upon the consultative examiners' findings in reaching his conclusion that plaintiff's musculoskeletal or neurological disorder only "minimally affected" his ability to work; and (2) the ALJ fully considered the additional records submitted by plaintiff at the hearing. Therefore, plaintiff's argument is misplaced and is, in fact, completely inapposite with regard to the ALJ's analysis of plaintiff's orthopedic and neurological impairments.

### 6. Allegations Against Patterns in Dr. Meadow's Feedback

Plaintiff provides no basis for his discrediting allegations against Dr. Meadow's consultative and reviewing procedures. (Pl.'s Mem. at 16-17.) When Ortega visited Dr. Meadow – the state's consultative psychiatrist provided for Ortega in the absence of Ortega's own treating psychiatrist – Ortega received a medical evaluation not inconsistent with other medical evaluations provided by his other physicians. (Tr. 185-87.) Just as Dr. Meadow opined that Ortega's psychiatric disorder "would not necessarily interfere with his ability to function [at work]" in his psychiatric evaluation (Tr. 186), Dr.

King reported in his psychiatric evaluation that Ortega retained a satisfactory ability to function "in a work setting" despite mild depression and anxiety. (Tr. 121.) Because the record is consistent with Dr. Meadow's findings and because plaintiff provides no support for his allegations, the argument that Dr. Meadow's opinions are not rationally supported is without merit.

### 7. ALJ's Consideration of the Combined Effects of Claimant's Impairments

Plaintiff alleges that the ALJ did not consider the combined effects of the claimant's psychiatric, neurological and orthopedic impairments. (Pl.'s Mem. at 17.) However, in the ALJ's decision, he referred broadly to Ortega's alleged impairments when addressing all of Ortega's claimed symptoms as they related to the severity assessment. (Tr. 273-75.) The ALJ also specifically referenced the lack of an obvious "combination of impairments," explaining the difficulty he faced in finding any medically determinable impairment that met the criteria of disability. (Tr. 275); *see* 20 CFR §§ 404.1521, 416.921, 404.1529, and 416.929; *see also* S.S.R. §§ 85-28 and 96-3p. Moreover, after noting that Ortega's hypertension and diabetes were severe, the ALJ again found that "even in combination" Ortega's impairments do not meet the standard necessary to be eligible for benefits, because Ortega had no other medically documented impairment that, "when considered in conjunction with his [hypertension and diabetes], would meet or medically equal the level of severity contemplated by any listed impairment." (Tr. 275.) Because this issue was addressed and dismissed in accordance with the regulations as to non-severe impairments, this argument is without merit.[9]

---

[9] Plaintiff erroneously states that the ALJ "did not address how . . . the evidence could be reasonably

### 8. Credibility of Claimant

The ALJ is required to "consider all [of a claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically." *Kleiman v. Barnhart*, No. 03-CV-6035 (GWG), 2005 U.S. Dist. LEXIS 5826, at *32 (S.D.N.Y. Apr. 8, 2005) (citing *Williams*, 859 F.2d at 260-61 (holding that, where an ALJ rejects witness testimony as not credible, the ALJ must set forth the basis for this finding "with sufficient specificity to permit intelligible plenary review of the record")). The regulations list specific factors to be considered when evaluating subjective

---

be [sic] interpreted as to support an ability to perform past relevant work, considering the claimant's combination of allegedly non-severe impairments." (Pl.'s Mem. at 18.) In fact, the ALJ noted specifically that, though he found it "difficult" to consider any of claimant's alleged impairments to have "significantly interfered with his ability to meet the basic physical and mental demands of work for any continuous 12 month period since December 2000," he would resolve all reasonable doubt in claimant's favor, considering the lifelong maintenance and treatment required by hypertension and diabetes, and would find at least those impairments to be severe. (Tr. 275.) Again, resolving all reasonable doubt in the claimant's favor, the ALJ then found that Ortega could *not* perform his past relevant work as a fork-lift operator, even though it is recognized as medium work in the national economy, because Ortega claimed his particular job as a forklift operator required more than medium work. (Tr. 276.) Although giving Ortega the benefit of the doubt on that issue of his past relevant work, the ALJ then concluded that he could perform medium work in the national economy under existing guidelines. (Tr. 276.)

complaints. *See* 20 C.F.R. § 416.929(c)(3).[10] Limited treatment is not by itself necessarily a dispositive factor weighing against plaintiff's credibility.[11]

Plaintiff argues that the ALJ did not follow the correct legal standard when rejecting his credibility. Plaintiff points to S.S.R. 96-7p to state that the ALJ may not draw inferences about an individual's symptoms from a failure to seek regular medical treatment without first considering the individual's explanations or other information in the case record. (Tr. 19.) While plaintiff correctly states the law, this rule does not apply here. While the ALJ noted Ortega's "somewhat sporadic" treatment and that Ortega had had no treating psychiatrist, the ALJ did not discredit claimant's testimony on that basis. (Tr. 20.) The ALJ did seek information from Ortega at the hearing about his reasons for leaving Dr. Sarro and learned that there was a situation with Ortega's health plan that restricted Ortega's healthcare options. (Tr. 255.) Plaintiff also argues that exaggeration of symptoms may be a symptom itself and not a reason for the ALJ to discredit plaintiff. (Pl.'s Mem. at 21.) The ALJ took note of Ortega's claims and fully evaluated all of the evidence in the record to make his determination.

The ALJ had sufficient reasons to find Ortega's complaints not credible to meet the level of severity to establish disability. Besides noting Ortega's treatment history, the ALJ noted Ortega's own statements about his pain, the medical evidence, and his activities of daily living. (Tr. 275-76.) Indeed, the ALJ noted that there was very little objective medical evidence in the record, but also noted that Ortega had never been hospitalized for treatment of his diabetes, hypertension, or any other issue. (Tr. 275.) The ALJ considered Ortega's medications as well as his daily activities, which included cleaning and shopping for groceries. (Tr. 275-76; *see also* Tr. 252.) Ortega did not establish that his pain or other symptoms were disabling or prevented him from performing medium work, and the ALJ was not obligated to accept Ortega's testimony about his complaints and restrictions without question. *See Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998) (quoting *Misuraca v. Sec'y of Health and Human Servs.*, 562 F. Supp. 243, 245 (E.D.N.Y.1983)); *see also Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994).

---

[10] 20 C.F.R. § 416.929(c)(3) provides in relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

[11] Inability to afford treatment and medications is a justifiable explanation for lack of treatment. *See Iuteri v. Barnhart*, No. 03-CV-393 (MRK), 2004 WL 1660580, at *12 (D. Conn. Mar. 26, 2004) (quoting S.S.R. 96-7p).

Here, Ortega's alleged impairments were compared to objective medical evidence to determine whether a disability exists, as provided in the regulations. 20 C.F.R. § 404.1529(c)(2); SSR § 96-7p.

The ALJ detailed the factors he considered in assessing Ortega's subjective complaints, as per sections 404.1529 and 416.929 of Regulations Nos. 4 and 16 and S.S.R. § 96-7p, as follows:

No hospitalizations or emergency room visits for treatment of symptoms or manifestations of hypertension or diabetes or any other medically determinable impairment are documented in the record or alleged. . . . Also of note, vis-a-vis his complaints of shoulder and leg pain, is the absence of evidence showing that he has taken prescription or even non-prescription analgesics or anti-inflammatory [pain] medication []. In this regard, although Celebrex and Ultracet were prescribed in June 2003, it is not documented that the claimant ever filled those prescriptions or that subsequent prescriptions for pain medication were ever written by Drs. Saro or Raffinan. Further reducing the overall credibility of the claimant is the variety and scope[] [of] his activities of daily living, which reportedly includes shopping, taking public transportation, going for walks, reading, listening to the radio . . . ; the fact that there has been little change in his diabetes and hypertension treatment regimen over the years, a circumstance that suggests that treatment has, for the most part, been effective in controlling these conditions without significant side effects; his continued smoking contrary to the repeated recommendations of his treating

sources; and the overall lack of consistency of complaints he has reported to his treating sources; and the overall lack of consistency of the complaints he has reported to his treating sources and other examiners. In addition to the above, it is noted that no treating source ever declared the claimant to be disabled.

(Tr. 275-76.) In determining Ortega's credibility, the ALJ evaluated Ortega's subjective complaints based on the listed factors to reach his conclusion. The ALJ summarized Ortega's daily activities; he asked about the location, duration, frequency, and intensity of his pain and other symptoms (including dizziness and numbness) during the hearing; he referenced the lack of necessary hospitalization and a potential lack of treatment by pain medication; the ALJ also noted the lack of evidence showing the measures that Ortega took to relieve his symptoms, and additional factors, including Ortega's failure to follow doctors' orders for a healthier lifestyle and the indications of Ortega having had consistently effective treatment for his hypertension and diabetes. Because the ALJ offered detailed, specific reasons to explain his evaluation of Ortega's credibility, an argument that substantial evidence does not support his determination is without merit.

Accordingly, the Court finds that, in light of the evidence in the record as a whole, the ALJ properly considered plaintiff's testimony applying the correct legal standards, and that substantial evidence supports the determination that plaintiff's allegations and complaints of a disabling condition in or after December 2001 were not supported.

III.  CONCLUSION

For the foregoing reasons, respondent's motion for judgment on the pleadings is granted and plaintiff's motion is denied.  The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 15, 2007.
Central Islip, NY

* * *

Attorney for plaintiff is Herbert S. Forsmith, 26 Broadway, 17th Floor, New York, New York, 10004. Attorney for defendant is Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, by Margaret Ann Donaghy, Assistant United States Attorney, Eastern District of New York, One Pierrepont Plaza, Brooklyn, New York 11201.